**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| ANTONIO FRANCIS BUEHLER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | A-13-CV-1100-ML |
| | § | |
| CITY OF AUSTIN/AUSTIN POLICE | § | |
| DEPARTMENT; AUSTIN POLICE | § | |
| OFFICER PATRICK OBORSKI; | § | |
| AUSTIN POLICE OFFICER ROBERT | § | |
| SNIDER; AUSTIN POLICE OFFICER | § | |
| JUSTIN BERRY; and SERGEANT ADAM | § | |
| JOHNSON, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants' Motion for Summary Judgment, filed November 11, 2014

(Clerk's Dkt. No. 92); Plaintiff's Response to Defendant's Motion for Summary Judgment, filed

December 12, 2014 (Clerk's Dkt. No. 97); Defendants' Objections and Motion to Strike Plaintiff's

Summary Judgment Evidence, filed December 23, 2014 (Clerk's Dkt. No. 101); Defendants' Reply

to Plaintiff's Response to Defendants' Motion for Summary Judgment, filed December 23, 2014

(Clerk's Dkt. No. 102); Plaintiff's Response to Defendants' Motion to Strike Plaintiff's Summary

Judgment Evidence, filed January 6, 2015 (Clerk's Dkt. No. 105); Defendants' Objections and

Supplemental Motion to Strike Plaintiff's Summary Judgment Evidence, filed January 7, 2015

(Clerk's Dkt. No. 106); Defendants' Reply to Plaintiff's Response to Motion to Strike Plaintiff's

Summary Judgment Evidence, filed January 7, 2015 (Clerk's Dkt. 107); Plaintiff's Response to

Defendants' Objections and Supplemental Motion to Strike Plaintiff's Summary Judgment Evidence,

1

filed January 14, 2015 (Clerk's Dkt. No. 108); Defendants' Reply to Plaintiff's Response to Supplemental Motion to Strike Plaintiff's Summary Judgment Evidence, filed January 15, 2015 (Clerk's Dkt. No. 111); and Defendants' Motion to Quash Subpoenas, filed February 13, 2015 (Clerk's Dkt. No. 115).

The parties consented to this Court's jurisdiction, and the case was assigned to this Court's docket for all purposes on March 18, 2014. (Clerk's Dkt. No. 21). Having considered the briefing and the applicable case law, Defendant's Motion for Summary Judgment (Clerk's Dkt. No. 92) is **GRANTED** as fully set forth below.

## I. BACKGROUND

Plaintiff brought this cause of action against the City of Austin ("City"), Austin Police Department ("APD"); Police Chief Art Acevedo ("Chief Acevedo"); Police Officers ("Officers") Patrick Oborski ("Officer Oborski"), Robert Snider ("Officer Snider"), and Justin Berry ("Officer Berry"); and Sergeant Adam Johnson ("Sergeant Johnson"). By way of his second amended complaint, Plaintiff alleges he was on multiple occasions unlawfully arrested, wrongfully detained in jail, wrongfully prosecuted, and wrongfully deprived of his camera for filming police officers in the commission of their duties. (2d Am. Compl.). He further alleges APD and Chief Acevedo were aware Plaintiff's rights had been violated, but took no action to remedy the violations. (*Id.*).

Defendants filed a motion to dismiss the action. (Clerk's Dkt. No. 18). The Court granted in part and denied in part the motion to dismiss. (Clerk's Dkt. No. 54). Accepting the facts alleged in the complaint as true, as the Court is required to do at the motion to dismiss stage, the Court found Buehler had stated: (1) Section 1983 claims against the Officers in their individual capacities for First Amendment freedom of speech, assembly, and retaliation violations, and Fourth and Fourteenth

Amendment false arrest and unlawful search and seizure violations; (2) claims for failure to establish a policy, failure to train, and failure to supervise asserted against the City; (3) claims against the City and the Officers in their individual capacities for equitable relief brought under Sections 8, 9, 19, and 27 of the Bill of Rights to the Texas Constitution; and (4) state-law tort claims against the Officers in their individual capacities for conversion, false arrest, and false imprisonment. (Clerk's Dkt. No. 54 at 36). The remaining claims were dismissed. (*Id.*).

The Court further found, accepting the factual allegations in the complaint as true, the Officers were not entitled to qualified immunity at that stage because filming and photographing a police officer performing official duties is a clearly established constitutional right, and a reasonable officer would not have arrested Buehler for exercising that right. (*Id.* at 20–21).[1] The City, APD, Officers Oborski, Snider, and Berry, and Sergeant Johnson (collectively, "Defendants") remain as defendants in this case. The other named defendants were dismissed.

Defendants filed a motion for summary judgment as to the remaining claims and defendants, to which Plaintiff responded. The motion is now ripe for the Court's consideration.

## II. STANDARD OF REVIEW

### A. Summary Judgment

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Royal v. CCC*

---

[1] At the motion to dismiss stage, the Court was not provided with any evidence relating to a grand jury action.

& R Tres Arboles, L.L.C., 736 F.3d 396, 400 (5th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986)). The Court will view the summary judgment evidence in the light most favorable to the non-movant. *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." *Davis v. Fort Bend Cty.*, 765 F.3d 480, 484 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Celotex*, 477 U.S. at 323; *Celtic Marine Corp. v. James C. Justice Co., Inc.*, 760 F.3d 477, 481 (5th Cir. 2014). The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Celtic Marine*, 760 F.3d at 481 (citing *Celotex*, 477 U.S. at 325). Once the non-movant has been given the opportunity to present evidence to create a genuine issue of fact, the court will grant summary judgment if no reasonable juror could find for the non-movant. *Boos v. AT&T, Inc.*, 643 F.3d 127, 130 (5th Cir. 2011).

## III.   SUMMARY JUDGMENT EVIDENCE

### A.   Undisputed Facts

On January 1, 2012 in the early morning, Officer Oborski and Officer Snider were engaged in a DWI traffic stop in front of a gas station. (Def. Exs. 2, 3; Pltf. Exs. 1, 11). Officer Oborski was conducting a sobriety test on the driver of the car ("DWI suspect"), when Buehler stopped at the gas station. (Pltf. Ex. 11). Buehler was driving a truck accompanied by a single passenger. (Pltf. Ex. 1). After a verbal exchange with the passenger of the DWI suspect ("DWI passenger"), Officer

Snider began attempting to remove the DWI passenger from the car. Buehler got out of the truck and started taking cell phone photos of the Officer Snider as he continued his attempts to remove the DWI passenger. (Def. Exs. 2–4). Although the events that occurred next are disputed, it is undisputed that Buehler was arrested and charged with resisting arrest.[2] On January 1, 2012, a magistrate for the Municipal Court of Travis County, Austin, Texas issued an arrest warrant finding probable cause to arrest Buehler for third-degree felony harassment of a public servant, in violation of Texas Penal Code § 22.11. (Def. Ex. 1 at 1–2). During the January 2013 term, a grand jury no-billed the charge for felony harassment of a public servant, and indicted Buehler for the lesser charge of knowing failure to obey a lawful order of a peace officer, a Class C Misdemeanor, in violation of City of Austin Municipal Ordinance § 9–4–51, for failing to put his hand behind his back. (Def. Ex. 1 at 3). In October 2014, a jury trial was held on the charge of failure to comply with a lawful order of a peace officer. On October 23, 2014, the jury found Buehler not guilty of the charge. (Pltf. Ex. 38).

Buehler formed the Peaceful Streets Project ("PSP") after his January 1, 2012 arrest. (Pltf. Ex. 22 at 14–20). PSP is a nonprofit watchdog group aimed at monitoring police conduct. PSP began routinely filming police officers conducting arrests and investigations. (*Id.*).

On August 26, 2012, Officer Evers was in the process of executing an outstanding arrest

---

    [2] The Court takes judicial notice of the public records related to this arrest, available on the Travis County Clerk's website, http://www.traviscountyclerk.org/eclerk/, which specify that Buehler was arrested on this date for Resisting Arrest, Search, or Transportation. The Court also takes judicial notice of the public records related to the August 26, 2012 and September 21, 2012 arrests, available on the Austin Municipal Court Public Inquiry website, https://www.austintexas.gov/AmcPublicInquiry/search/psnsearch.aspx, which specify that the cases were dismissed and terminated, respectively. *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (approving judicial notice of public records by district court reviewing motion to dismiss). The Court finds that these facts are not subject to reasonable dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. *See id.* (citing FED. R. EVID. 201(b)).

warrant. (Def. Ex. 5). During the arrest, Buehler and members of PSP arrived and began videotaping. Officer Berry thereafter requested backup and Officer Evers arrived on the scene. (Def. Exs. 5, 6). After an exchange with Buehler, the details of which are disputed, Officer Berry arrested Buehler and seized his camera (*Id.*). Buehler was charged with interference with public duties. On August 26, 2012, a magistrate for the Municipal Court of Travis County, Austin, Texas issued an arrest warrant finding probable cause to arrest Buehler for interference with public duties, a Class B Misdemeanor, in violation of Texas Penal Code § 38.15. (Def. Ex. 1 at 4–5). During the January 2013 term, a grand jury no-billed Buehler for interference with public duties, and indicted Buehler for knowing failure to obey a lawful order of a peace officer, a Class C Misdemeanor, in violation of City of Austin Municipal Ordinance § 9–4–51, for failing to back up when ordered to do so by Officer Berry. (Def. Ex. 1 at 6). According to public records related to this arrest, the charge was ordered dismissed by an Austin Municipal Court judge on February 19, 2015.

On September 21, 2012, Officer Oborski was conducting a DWI traffic stop when Buehler and four members of PSP arrived and began filming. (Pltf. Exs. 19, 20, 22). Officer Oborski requested backup and Sergeant Johnson arrived on the scene. After a confrontation with Buehler, the facts of which are disputed, Sergeant Johnson and another officer arrested Buehler and charged him with interference with public duties. (Def. Exs. 7, 8). On September 21, 2012, a magistrate for the Municipal Court of Travis County, Austin, Texas issued an arrest warrant finding probable cause to arrest Buehler for interference with public duties, a Class B Misdemeanor, in violation of Texas Penal Code § 38.15. (Def. Ex. 1 at 7–8). During the January 2013 term, a grand jury no-billed Buehler for interference with public duties, and indicted Buehler for knowing failure to obey a lawful order of a peace officer, a Class C Misdemeanor, in violation of City of Austin Municipal Ordinance

§ 9–4–51, for failing to move as instructed by Sergeant Johnson. (Def. Ex. 1 at 10). According to public records related to this arrest, the case was terminated on July 29, 2013.

**B.    Disputed Facts**

Defendants contend that on each occasion Buehler was arrested, he either refused an order from an Officer or otherwise interfered with an Officer's official duties. Buehler contends he was unlawfully arrested for filming the Officers in the commission of their official duties and for forming PSP. The factual discrepancies are detailed below.

1.    *January 2, 2012 Incident*

a.    Defendants' Version

Defendants maintain that on January 1, 2012, the DWI driver admitted she had been drinking and her passenger was intoxicated. Officer Oborski testified the DWI passenger would not stop yelling while Officer Oborski conducted a field sobriety test on the driver. (Def. Exs. 2, 3). Officer Oborski called for backup, and when Officer Snider arrived, the DWI passenger refused Officer Snider's verbal directives to stop yelling and texting on her cell phone. According to Officer Snider, APD officers are trained to not allow talking or texting because the subject may be attempting to recruit others to interfere with the traffic stop. (Def. Exs. 13, 4). The Officers contend that when they attempted to remove the DWI passenger from the car for refusing their orders, Buehler began shouting accusations and profanities. (Def. Ex. 1). The Officers further testified that the DWI passenger refused to stand, went limp, and began yelling when she realized she was being filmed. (Def. Ex. 2–4). Buehler apparently moved closer to take photos, while his passenger stayed back and filmed.

After the DWI passenger was handcuffed and in the patrol car, Officer Oborski purportedly

asked Buehler why he was interfering with an arrest. (Def. Exs. 2–3). According to Defendants, Buehler became verbally aggressive, and Officer Oborski "placed his hand on [Buehler's] shoulder to keep a distance" between himself and Buehler. (Def. Ex. 3 ¶ 20). Officer Oborski believed Buehler spit in his face and confronted Buehler about it, although Buehler denied spitting. Officer Oborski then arrested Buehler for spitting on him and repeatedly commanded Buehler to stop resisting and put his hands behind his back. (Def. Exs. 2–4). Buehler would not comply. Because a prolonged struggle risks injuring those involved, Officer Snider drew his taser and warned Buehler to comply. Buehler became compliant and was handcuffed. Defendants further maintain that while Buehler was being escorted to the patrol vehicle, he made accusations that the Officers were going to beat him up. The Officers never asked Buehler or his passenger to stop filming and gave them both assurances that APD had no problem with being filmed while performing their duties. (Def. Exs. 2–3).

b.      Plaintiff's Version

Buehler contends the DWI passenger was attempting to tell the DWI driver she could refuse to submit to a field sobriety test. When the Officers began pulling the DWI passenger out of the car, she purportedly yelled in pain and fear. (Pltf. Ex. 15). Buehler states that he asked Officer Oborski why he was pulling the DWI passenger out of the car, to which Officer Oborski responded, "Worry about yourself." (Pltf. Ex. 14). The DWI passenger pleaded with Buehler to record her as she was being detained. Buehler, believing the Officers were abusing the DWI passenger, moved within about 17 feet of Officer Oborski to take photos. (Pltf. Ex. 1). Officer Oborski placed the DWI passenger in the police cruiser. He then approached Buehler, who was standing against the tailgate of the truck. Buehler and Officer Oborski got into a verbal altercation regarding the DWI

passenger's treatment. Officer Oborski purportedly poked Buehler in the chest, which Buehler contends is an assault. (Pltf. Ex. 13, 15). Buehler asked Officer Oborski why he was touching him. Officer Oborski replied that Buehler was interrupting his investigation, which Buehler denied. (Pltf. Ex. 14). Officer Oborski then pulled out his handcuffs while pushing Buehler towards the tailgate of the truck. Buehler again told Officer Oborski that he was not interfering. Buehler also pointed out to Officer Oborski that he did not approach Officer Oborski, rather, Officer Oborski approached him. (*Id.*).

Officer Oborski pulled Buehler away from the truck and began to wrestle him to the ground. Buehler claims Officer Oborski put him in a chokehold and told him to stop resisting. Buehler responded that he was not resisting. (*Id.*). Buehler contends that Officer Oborski was attempting to dislocate his elbow by placing Buehler in an arm lock and applying force to the back of his elbow. (Pltf. Ex. 1). Buehler and Officer Oborski continued to argue, and Officer Oborski told Buehler he should have just paid attention to himself and listened to the Officers when they told him what to do. (Pltf. Ex. 14). Another officer took Buehler to the Blood Alcohol Testing ("BAT") bus. Officer Oborski shortly thereafter arrived at the BAT bus, purportedly grabbed and twisted Buehler's hand and wrist, and took Buehler to jail. (Pltf. Ex. 1).

### 2. August 26, 2012 Incident[3]

#### a. Defendants' Version

On August 26, 2012, Officer Evers was patrolling downtown Austin at night on foot to

---

[3] Defendants' summary judgment evidence includes reference to an incident that occurred on August 24, 2012. Defendants contend that on that date, Officer Berry encountered Buehler while conducting an undercover operation. According to Officer Berry, Buehler disclosed his undercover status on the video recording, which Buehler later posted to a social media website. This disclosure purportedly caused an undercover operation to be shut down and for Officer Berry to be removed from undercover work. However, Defendants fail to describe why this incident is germane to Buehler's August 26, 2012 arrest.

execute an outstanding arrest warrant. (Def. Ex. 5). Officer Evers located the subject and the subject's girlfriend and began arresting the subject. During the course of the arrest, PSP members surrounded Officer Evers and the subject and began videotaping. The subject and his girlfriend purportedly became uncooperative and Officer Evers could not effectuate the arrest while keeping a visual on the people surrounding him. Officer Evers made three calls for backup because he was concerned for his safety and the situation was escalating. (Def. Ex. 5–6). Officer Berry arrived and made several requests for the PSP members to step back, but repeatedly assured them they could continue filming. Buehler was the only PSP member who did not step back. (Def. Exs. 5–6, 9). The subject and his girlfriend became agitated because Buehler refused to stop filming, and Officer Evers had to restrain the subject. The subject stated Buehler was agitating him and harassing him. According to Officer Evers, the subject tripped as he was confronting Buehler, which caused Officer Evers to stumble. (Def. Exs. 2, 5–6, 9, 13).

Officer Berry warned the PSP members that refusal to back up would result in arrest. He maintains that he then arrested Buehler because of his refusal to move back. Officer Berry assured Buehler that he did not turn off his camera as he was being arrested, and left the camera hanging around Buehler's wrist. (Def. Exs. 5–6, 9).

b.    Plaintiff's Version

On August 26, 2012, Buehler and three other PSP members were downtown to "cop watch." Buehler and the PSP members observed Officer Evers arresting a subject and began filming. (Pltf. Exs. 3, 12, 22). The woman with the subject asked Buehler and the other PSP members why they were filming. Buehler approached her and explained the purpose of PSP. The woman then hugged Buehler and returned to the subject. (Pltf. Ex. 22). Officer Castillo joined Officer Evers, and the

Officers, subject, and woman began walking toward the booking facility. Buehler and one other PSP member followed them and continued to film. (Pltf. Ex. 5). The Officers then stopped in the middle of the road. Officer Berry arrived and told Buehler to step back. Buehler contends the other PSP member was nearer to the subject than Buehler. Officer Berry then warned Buehler, "This is your last chance. You're preventing the officer from safely walking . . . . You're agitating this person right here." (Pltf. Ex. 17). Buehler asked Officer Berry for his badge number, and Officer Berry repeated his order to step back. Officer Berry then arrested Buehler, but did not arrest the other PSP member. (Pltf. Exh. 22).

### 3. September 21, 2012 Incident

#### a. Defendants' Version

On September 21, 2012, Officer Oborski was engaged in a DWI stop when Buehler and three other PSP members arrived at the scene. (Def. Exs. 7–8). Two PSP members positioned themselves west of the DWI stop and Buehler and another PSP member positioned themselves east of the stop. Purportedly, because Officer Oborski was surrounded by PSP members on both sides, he instructed the PSP members east of the stop to move back. (Def. Ex. 3). After Buehler and the other PSP member refused Officer Oborski's repeated directives, Officer Oborski radioed for backup. (Def. Exs. 7–8). Sergeant Johnson arrived, and Buehler refused his repeated requests to move and stand with the other PSP members to protect the Officers' safety. Buehler was handcuffed and placed under arrest by Sergeant Johnson for his refusal to move. At no time were any of the PSP members asked to stop filming. (*Id.*).

#### b. Plaintiff's Version

Buehler and three other PSP members observed a traffic stop on West 6th Street. They

parked their car and walked up to the scene, about six to eight feet from the subject car, and about 25 feet from the squad car and Officer Oborski. (Pltf. Ex. 22). Officer Oborski saw Buehler and the PSP members, and using the loudspeaker told them to back up. (Pltf. Exs. 19, 20). Buehler asked how far, and Officer Oborski again told him to back up. Buehler again asked how far, and Officer Oborski said to back up until he says to "stop." Buehler and the other PSP member backed up about ten more feet and began filming the traffic stop.

Sergeant Johnson arrived on the scene and told Buehler and the other PSP member to walk toward and past Officer Oborski to where the other PSP members were filming, which was quite a distance away. (Pltf. Ex. 22). Sergeant Johnson stated the Officers needed the space where Buehler and the other PSP member was to conduct the DWI stop. (Pltf. Ex. 7). Buehler believed they were being set up to be arrested, because the two Officers' directives conflicted with each other. Buehler then asked what was wrong with where they were standing, and stated they were not interfering or threatening. (Pltf. Ex. 19). Sergeant Johnson claimed his order was lawful and to stand where the other PSP members were filming on the west side of the stop. Buehler responded that he would not be able to film well or gather audio from that distance.

Buehler began backing away and continued backing away until he was arrested. While backing away, Buehler asked Sergeant Johnson if they were about 50 feet away, and said "is that too close, really?" (Pltf. Ex. 19). Sergeant Johnson asked Buehler if he was going to fail to comply with his directive to stand with the other PSP members. Buehler said he "just want[ed] [Sergeant Johnson] to give [him] like a really good reason before [Sergeant Johnson] start[ed] barking orders." (*Id.*). Sergeant Johnson replied that if Buehler did not comply, he was going to arrest him for failure to obey a lawful order. According to Buehler, at that time he had backed up approximately 65 feet

from the DWI suspect. Sergeant Johnson repeated his order and said Buehler could also choose to leave the scene. (Pltf. Exs. 19, 22). Buehler said he was going to leave, but asked why Sergeant Johnson was bossing them around and being a bully. Sergeant Johnson then arrested Buehler.

## IV. APPLICABLE LAW

### A. Qualified Immunity

Qualified immunity protects state officials from civil damages liability under Section 1983 in their individual capacities unless a plaintiff can show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2080 (2011) (citation omitted); *see Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013) (same). The Fifth Circuit has characterized evaluation of qualified immunity as "a two-step process," with "the burden [] on the plaintiff to prove that a government official is not entitled to qualified immunity." *Wyatt v. Fletcher*, 718 F.3d 496, 502 (5th Cir. 2013) (citing *Michalk v. Hermann*, 422 F.3d 252, 258 (5th Cir. 2005)). However, courts may choose to address the prongs in either order. *Pearson v. Callahan*, 555 U.S. 223, 225 (2009).

First, the plaintiff must demonstrate a violation of a clearly established right. *Id.* Conduct violates a clearly established right when the contours of the right are sufficiently clear that every reasonable official would have understood that the conduct at issue violates the right. *al-Kidd*, 131 S.Ct. at 2083. To find that a right is clearly established, the court "must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (quoting *al-Kidd*, 131 S.Ct. at 2084) (internal quotation marks omitted). Although a case directly on point is not required, "existing precedent must have placed the statutory or

constitutional question beyond debate." *al-Kidd*, 131 S.Ct. at 2083. The Supreme Court recently reiterated this "beyond debate" standard in *Lane v. Franks*, 134 S.Ct. 2369, 2383 (2014).

Second, the court must determine whether the defendant's conduct as alleged was reasonable. *Wyatt*, 718 F.3d at 503. Put another way, "[f]or immunity to apply, the actions of the officer must be objectively reasonable under the circumstances, such that a reasonably competent officer would not have known his actions violated then-existing clearly established law." *Mesa v. Prejean*, 543 F.3d 264, 269 (5th Cir. 2008) (citation and internal quotation marks omitted); *see also Morgan*, 659 F.3d at 372 ("The *sine qua non* of the clearly-established inquiry is fair warning," meaning that the "right has been defined with sufficient clarity to enable a reasonable official to assess the lawfulness of his conduct." (citations and internal quotation marks omitted)).

## B. First and Fourth Amendments

The First Amendment protects a private citizen's right to assemble in a public forum, receive information on a matter of public concern—such as police officers performing their official duties—and to record that information for the purpose of conveying that information. *See Shillingford v. Holmes*, 634 F.2d 263, 264, 266 (5th Cir. 1981) (stating that police officer's "unprovoked and unjustified" assault of plaintiff who "was photographing what the policeman did not want to be memorialized" and "was not involved in the arrest incident and did not interfere with the police in any fashion" established a deprivation of constitutional rights), *abrogated on other grounds by Valencia v. Wiggins*, 981 F.2d 1440 (5th Cir. 1993). *See, e.g.*, *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595, 608 (7th Cir. 2012) (stating that making a recording "is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording" and finding that plaintiffs were likely to prevail on their claim

that state eavesdropping statute interfered with right to record police officers "engaged in their official duties in public places"); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (finding, in case involving citizens videotaping police, that "[t]he First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest."); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing, in case involving citizen filming police officers, a "First Amendment right to film matters of public interest").

The proposition that an individual cannot be retaliated against for expression protected by the First Amendment is uncontroversial. *See Keenan v. Tejeda*, 290 F.3d 252, 259 (5th Cir. 2002) ("The First Amendment prohibits . . . adverse governmental action against an individual in retaliation for the exercise of protected speech activities." (citation omitted)). Similarly, the Court agrees with Buehler's assertion that "[t]he disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department." *Brawner v. City of Richardson, Tex.*, 855 F.2d 187, 191–92 (5th Cir. 1988).

However, "neither the First Amendment right to receive speech nor the First Amendment right to gather news is absolute." *Davis v. E. Baton Rouge Parish Sch. Bd.*, 78 F.3d 920, 928 (5th Cir. 1996). Courts have recognized that the right to record police officers is "subject to reasonable time, place and manner restrictions." *Smith*, 212 F.3d at 1333; *see also Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011) (same); *Crawford v. Geiger*, __F. Supp. 2d__, 2014 WL 554469, at *11 (N.D. Ohio Feb. 10, 2014) (same). Similarly, the First Amendment does not grant citizens unrestrained license to violate valid criminal laws. *See Peavy v. WFAA-TV Inc.*, 221 F.3d 158, 185 (5th Cir. 2000) ("It would be frivolous to assert . . . that the First Amendment, in the interest of securing news

15

or otherwise, confers a license . . . to violate valid criminal laws." (quoting *Brazenburg v. Hayes*, 408 U.S. 665, 691 (1972)).

The Fourth Amendment to the United States Constitution affords citizens the right to be free from unlawful arrest, that is, arrest without probable cause. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 206 (5th Cir. 2009) (citations omitted); *Gerstein v. Pugh*, 420 U.S. 103, 111–12 (1975); *Beck v. Ohio*, 379 U.S. 89, 91 (1964). To succeed on a claim for false arrest under Section 1983, the plaintiff must demonstrate that he was arrested without probable cause to believe he committed an offense. *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004). "Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Id.* at 655–56 (citation and internal quotation marks omitted). "It is well-settled that when probable cause exists to believe that someone is violating a criminal statute, his or her arrest is reasonable." *Johnson v. City of Dallas*, 141 F. Supp. 2d 645, 647 (N.D. Tex. 2001) (citing *Atwater v. City of Lago Vista*, 195 F.3d 242 245(5th Cir. 1999)).

## V.    ANALYSIS

An obvious tension exists between a police officer and an individual observing and recording that police officer. As previously stated in the Court's order on the motion to dismiss, an individual has a constitutional right to assemble in a public place so as to observe and acquire information related to the police as they perform their official duties. At the same time, a police officer must be free to perform his official duties without undue interference so as to protect the officer and everyone in the vicinity. As this tension plays out, the officer on the scene of an arrest or investigation will be the arbiter of what constitutes a reasonable time, place, and manner for the exercise of the

individual's First Amendment right to record.

## A. Clearly Established Right

The Court reaffirms its finding in the order on the motion to dismiss: In light of the existing Fifth Circuit precedent and the robust consensus among circuit courts of appeals, the Court concludes that the right to photograph and videotape police officers as they perform their official duties was clearly established at the time of Buehler's arrests. (Clerk's Dkt. No. 54 at 20). *See Keenan*, 290 F.3d at 259 (retaliation for First Amendment exercise is unconstitutional); *Enlow v. Tishomingo County*, 962 F.2d 501 (5th Cir. 1992) (arrest for photographing police raid where claimant did not interfere was unconstitutional). *See also Glik*, 655 F.3d at 84 (finding First Amendment right to record police officers was clearly established at time of arrest). Similarly, "[t]he Fourth Amendment right to be free from false arrest—arrests without probable cause—was clearly established at the time of" Buehler's arrests. *Club Retro, L.L.C.*, 568 F.3d at 206 (citations omitted); *see also Gerstein*, 420 U.S. at 111–12 ("The standard for arrest is probable cause, defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" (quoting *Beck*, 379 U.S. at 91)).

Accordingly, having reiterated the findings that Buehler's right to record police officers in the commission of their official duties and right to be free from unlawful arrest are clearly established, the dispositive issue is whether the officers violated Buehler's statutory or constitutional rights. *See Ramirez*, 716 F.3d at 375 (prongs of qualified immunity are: (1) whether plaintiff makes out violation of constitutional right; and (2) whether the right is clearly established).

## B. Violation of Constitutional Right

To overcome qualified immunity, a plaintiff must have suffered a violation of his

constitutional rights. *See Russell v. Altom*, 546 F. App'x 432, 436 (5th Cir. 2013) (officers are entitled to qualified immunity in absence of constitutional violation). Because Buehler's constitutional claims arise out of allegedly unlawful arrests, all of Buehler's constitutional claims require an absence of probable cause to support his arrests. *See id.* (First and Fourth Amendment claims arising from allegedly unlawful arrest require lack of probable cause to arrest); *Mesa*, 543 F.3d at 273 (First Amendment claim is defeated where arresting officer has probable cause to arrest).

"If [probable cause] exists, any argument that the arrestee's speech as opposed to her criminal conduct was the motivation for her arrest must fail, no matter how clearly that speech may be protected by the First Amendment." *Mesa*, 543 F.3d at 273. The undersigned will therefore focus the analysis on whether the arrests at issue were unlawful due to a lack of probable cause. Defendants contend they are shielded from any liability arising out of Buehler's three arrests because an independent intermediary—a grand jury—found probable cause to charge Buehler with a crime after each arrest.

### 1. *Grand Jury Indictment*s

A grand jury thrice indicted Buehler for knowing failure to obey a lawful order of a peace officer, a Class C Misdemeanor, in violation of City of Austin Municipal Ordinance § 9–4–51. It is well established that a pre-arrest grand jury indictment insulates arresting officers from liability because an independent intermediary has found probable cause to charge a defendant with a crime. *Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010) (citing *Hand v. Gary*, 838 F.2d 1420, 1428 (5th Cir. 1988)). "[A]n indictment 'fair upon its face,' and returned by a 'properly constituted grand jury,' we have explained, 'conclusively determines the existence of probable cause' to believe the defendant perpetrated the offense alleged." *Kaley v. United States*, __U.S.__, 134 S.

Ct. 1090, 1097 (2014) (quoting *Gerstein*, 420 U.S. at 117, n.19).

Buehler contends a grand jury's probable cause finding post-arrest does not break the chain of causation because probable cause to arrest is based on an officer's knowledge at the moment of arrest, while a grand jury's finding is often based on more information. *See United States v. McCowan*, 469 F.3d 386, 390 (5th Cir. 2006) (stating the probable cause standard). However, the Fifth Circuit has on several occasions held that a grand jury's finding of probable cause to charge an arrestee with a crime—even when the indictment occurs post-arrest—breaks the chain of causation and creates a presumption of probable cause to arrest. *See Russell*, 546 F. App'x at 434 (man arrested for refusal to move away from dangerous work site and later indicted had no cause of action against arresting officer); *Hale v. Clayton*, 198 F.3d 241, 241 (5th Cir. 1999) (district court properly dismissed false arrest claim based on warrantless arrest because grand jury indictment broke chain of causation); *Taylor v. Gregg*, 36 F.3d 453, 456–57 (5th Cir. 1994), (noting that "[i]t is well settled that if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party" and applying that rule to false-arrest claimants who were indicted post-arrest), *overruled on other grounds by Castellano v. Fragozo*, 352 F.3d 939, 949 (5th Cir. 2003) (en banc).

Other circuits have agreed with Buehler's contention that a grand jury indictment post-arrest does not break the chain of causation. *See McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006) ("presumption of probable cause arising from indictment 'is totally misplaced'" when applied to false arrest, unlawful imprisonment, and unreasonable search and seizure actions (quoting *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003))); *Jones v. Cannon*, 174 F.3d 1271, 1285 (11th

Cir. 1999) (subsequent grand jury indictment after false arrest does not retroactively break chain of causation); *Arnott v. Mataya*, 995 F.2d 121, 124 (8th Cir. 1993) (grand jury's indictment for obstructing law enforcement officer does not insulate officers from liability). While other circuits comport with Buehler's analysis, the Fifth Circuit holdings in *Russell*, *Hale*, and *Taylor* are clear: A grand jury's finding of probable cause to charge a claimant with a crime insulates the arresting officers from claims arising from an allegedly unlawful arrest even if the indictment occurs post-arrest. The Court is therefore bound by the Fifth Circuit's conclusion and must apply it herein.

Buehler next argues that because the grand jury indictments are for lesser charges than the arrest, the grand jury indictments do not insulate Defendants from liability. He reasons the grand jury did not find probable cause to arrest him for the specific crimes alleged by the Officers, therefore evidencing a lack of probable cause to arrest him. However, "[t]he probable cause inquiry focuses on the validity of the arrest, not the validity of each individual charge made during the course of the arrest." *Russell*, 546 F. App'x at 436 (citing *Price v. Roark*, 356 F.3d 364, 369 (5th Cir. 2001), and *Wells v. Bonner*, 45 F.3d 90, 95 (5th Cir. 1995)). Therefore, a grand jury indictment that finds probable cause to charge a defendant with a different crime for the same conduct that caused his arrest will nevertheless sever the chain of causation. *See id.* (quoting *Cuadra*, 626 F.3d at 813) (officers were insulated where defendant who refused order to move out of dangerous area when photographing government crew's work, even though the grand jury indicted him on a different charge because "[w]hen the facts supporting an arrest 'are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party'"). The fact that the grand jury later indicted Buehler on charges that differed from those lodged by his arresting officers is thus inconsequential. *See id.* at 437

20

(where grand jury's indictment is sufficient to establish probable cause, "there is no need to address [the] argument regarding the lack of probable cause to support the initial charge" which was dropped).

Buehler further maintains the Officers attempted to "set him up" and were not actually threatened by his conduct, which evidences a lack of probable cause. However, as established above, a grand jury determined there was probable cause to arrest Buehler on each occasion. Therefore, regardless of the Officers' intent, even if malicious, there was an independent, objective source of probable cause to arrest Buehler. *See al-Kidd*, 131 S. Ct. at 2080 (citing *Whren v. United States*, 517 U.S. 806, 814 (1996)) (Fourth Amendment reasonableness is determined by asking whether "circumstances, viewed objectively, justify [the challenged] action. . . . If so, that action was reasonable '*whatever*' the subjective intent motivating the relevant officials."); *Webb v. Arbuckle*, 456 F. App'x 374, 380 (5th Cir. 2011) (listing cases that found officer's subjective intent or prextextual reason for arrest did not render arrest unconstitutional if independent, objective probable cause to arrest existed at time of arrest); *United States v. Castro*, 166 F.3d 728, 734 (5th Cir. 1999) (officers' subjective intent is irrelevant to objective reasonableness analysis). "[E]ven an officer [in Buehler's case] who acted with malice in procuring the warrant or indictment will not be liable if *the facts* supporting the warrant or indictment are put before an impartial intermediary such as a magistrate or grand jury." *Craig v. Dallas Area Rapid Transit Auth.*, 504 F. App'x 328, 332 (5th Cir. 2012) (quoting *Hand*, 838 F.2d at 1427); *see also Atwater*, 532 U.S. at 354 (if officer has probable cause to believe individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the individual).

Buehler also argues that because a jury found him not guilty of failure to obey a lawful order

on January 1, 2012, there was no probable cause to arrest him on that date.[4]  Specifically, because there was a jury instruction that Officer Oborski needed reasonable suspicion or probable cause to lawfully order Buehler to put his hands behind his back, the jury must have concluded there was no probable cause.  However, whether a charge is later dropped or a defendant is found not guilty is immaterial to the probable cause analysis.  *See Baker v. McCollan*, 443 U.S. 137, 145 (1979) ("The Constitution does not guarantee that only the guilty would be arrested.  If it did, § 1983 would provide a cause of action for every defendant acquitted—indeed, for every suspect released."); *Russell*, 546 F. App'x at 437 ("It is axiomatic that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge.  That has always been so . . . ." (quoting *Williams*, 504 U.S. at 51)); *Rodriguez v. Ritchey*, 556 F.2d 1185, 1190 n.21 (5th Cir. 1977), (a warrant is valid even if charges are later dropped or defendant is found not guilty), *overruled on other grounds by Malley v. Briggs*, 75 U.S. 335 (1986).  Therefore, the Court may properly presume the grand jury indictments will insulate Defendants from Buehler's claims unless Buehler can show the grand jury deliberations were tainted.  *Hand*, 838 F.2d at 1428.

### 2.    *Tainted Evidence Exception*

If a claimant can show the deliberations of the independent intermediary were in some way tainted by the defendant, the presumption of probable cause is rebutted.  *Id.*  However, a claimant must actually show the deliberations of the intermediary were tainted by the actions of the defendant.  *Craig*, 504 F. App'x at 332–33.  This requires an affirmative showing, and more than conclusory allegations or a scintilla of evidence.  *Id.* (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *Taylor*, 36 F.3d at 457; and *Hand*, 838 F.2d at 1428).

---

[4]  The undersigned also notes that the other charges against Buehler have since been dismissed.

In the response to the motion for summary judgment, Buehler contends for the first time that the evidence presented to the grand jury was tainted by the arresting officers. Accordingly, Buehler urges the Court to find there is a genuine issue of material fact regarding tainted grand jury deliberations.

However, Buehler has provided no direct or actual evidence that the grand jury's deliberations were tainted by any of the defendants. *See Taylor,* 36 F.3d at 457 (quoting *Hand*, 838 F.2d at 1421) ("[A]n independent intermediary breaks the chain of cuasation unless it can be *shown* that the deliberations of that intermediary were in some way tainted by the actions of the defendants." (emphasis in original)). Regarding the grand jury process, Buehler merely testified in his affidavit that in addition to himself, "it was confirmed that the following individuals testified at the Grand Jury: Ben Munoz, Norma Pizana, Ashley Hill, John Blackford, Elizabeth Mahoney, Carlos Amador, Officer Oborski, and Officer Snider." (Pltf. Ex. 22 at 32 n.197). As addressed above, it appears to be inconsequential in the Fifth Circuit that the grand jury was given information additional to an officer's knowledge at the time of arrest. Buehler therefore failed to address whether the grand jury was presented with or relied on any purportedly false or misleading statements by the arresting officers, and "a mere allegation of taint, without more, is insufficient." *Craig*, 504 F. App'x at 332 (citing *Taylor*, 36 F.3d at 457) (plaintiff did not overcome presumption that independent intermediary breaks chain of causation where "[the plaintiff] has not affirmatively shown, or attempted to show, what evidence the grand jury relied upon to return an indictment").

Buehler further maintains he has presented a genuine issue of material fact regarding grand jury taint because his law enforcement expert "believes that the [O]fficers' arrests were motivated by their perception of Antonio Buehler as opposed to legitimate law enforcement measures." (Pltf.

Resp. at 19).  Buehler's law enforcement expert makes only one mention of the grand jury's deliberations: "It has been my experience that a grand jury proceeding is a very one sided proceeding in that district attorneys (prosecutors) present only information to the grand jury that they believes [sic] supports an individual's guilt.  Defendants have no rights in this proceeding and are not represented, and therefore have no ability to present contradictory evidence to the members of the grand jury."  (Pltf. Ex. 37 at 12).  In sum, the law enforcement expert points out that grand jury proceedings are by nature one-sided.  However, "to make the [grand jury's] assessment *it has always been thought sufficient to hear only the prosecutor's side*."  *Russell*, 546 F. App'x at 437 (quoting *United States v. Williams*, 504 U.S. 36, 51 (1992)) (emphasis added).  Therefore, Buehler's law enforcement expert's opinion that grand jury proceedings are one-sided is insufficient to raise a fact issue regarding whether the grand jury deliberations were tainted.  *See Craig*, 504 F. App'x at 332–33 (DART employee's affidavit that officer would be willing to taint investigation was insufficient to overcome presumption, even if officers harbored ill-will toward claimant).

Accordingly, Buehler has failed to rebut the presumption that a grand jury indictment cuts off the chain of causation stemming from an allegedly unlawful arrest, insulating the arresting officers from Buehler's claims.  *See Hand*, 838 F.2d at 1427–28 (where no evidence grand jury deliberations were tainted, chain of causation is broken).  Having found the grand jury indictments returned in relation to each of Buehler's arrests establish probable cause in each instance, Buehler's claims under the Fourth and First Amendment must fail.  *See Russell*, 546 F. App'x at 436 (probable cause finding defeats First and Fourth Amendment claims); *Mesa*, 543 F.3d at 273 (probable cause finding defeats First Amendment claim).

Due to the prophylactic effect of the grand jury indictment, as applied in *Russell*, *Hale*, and

*Taylor*, the Court declines to address the remaining probable cause arguments advanced by Buehler.

Significantly, the Court declines to conduct its own independent review of the summary judgment evidence as to the issue of objective reasonableness of the Officers' conduct.[5]  *See e.g., Spencer v. Rau*, 542 F. Supp. 2d 583, 591 (W.D. Tex. 2007) (conducting thorough objective reasonableness analysis).  Accordingly, as a result of the indictments returned by the Travis County Grand Jury and Buehler's failure to show that the grand jury's investigation was tainted by any of Defendants, the Officers are entitled to qualified immunity.  *See Ramirez*, 716 F.3d at 375 (officer entitled to qualified immunity because probable cause existed for claimant's arrest).

### B.    Municipal Liability

Ordinarily a municipality cannot be held liable for the actions of its employees on a respondeat superior theory.  *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978). Instead, a plaintiff seeking to impose liability on a municipality must identify a policy or custom that caused the plaintiff's injury.  *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). "[M]unicipal liability under [S]ection 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694). As discussed above, the grand jury indictment establishes the existence of probable cause, consequently no violation of Buehler's constitutional rights has been shown.  Therefore, Buehler's

---

[5]  In light of the grand jury's independent role in finding probable cause, the Court also declines to address Defendants' contention that the magistrate's warrants insulate the Officers by breaking the chain of causation.  *See Murray v. Earle*, 405 F.3d 278, 292 (5th Cir. 2005) (magistrates' probable cause determination breaks chain of causation if facts supporting arrest are placed before magistrate).  Similarly, the Court declines to address Buehler's contention that the arrest warrants did not insulate the Officers because the Officers lied or omitted material facts in the warrant affidavits.  *See Hand*, 838 F.2d at 1427–28 (the chain of causation is not broken where law enforcement officials withheld relevant information or misled magistrate).

claims against the City and APD cannot survive summary judgment.

### C. State Law Claims

Buehler argues his state law claims do not fail because he has raised a genuine issue of material fact regarding probable cause. Pursuant to 28 U.S.C. § 1367, a federal court generally has supplemental jurisdiction over claims that are so related to the claims over which the court has original jurisdiction that they form part of the same case or controversy. However, the Court may decline to exercise supplemental jurisdiction over a claim if the court has dismissed all claims over which it has original jurisdiction. Because the summary judgment of Buehler's federal claims is warranted, the Court declines to exercise supplemental jurisdiction over his state law claims.

## VI. CONCLUSION

As the grand jury indictments sever the chain of causation and insulate Defendants absent evidence of tainted deliberations, Buehler has not established a violation of his constitutional rights. The Officers are therefore entitled to qualified immunity, and the causes of action against the Officers, APD, and the City must fail. The Court declines to exercise jurisdiction over Buehler's state law claims.

Accordingly, Defendants' Motion for Summary Judgment (Clerk's Dkt. No. 92) is hereby **GRANTED**.

Defendants' Motion for Judgment on the Pleadings (Clerk's Dkt. No. 67), Objections and Motion to Strike Plaintiff's Summary Judgment Evidence (Clerk's Dkt. No. 101), and Objections and Supplemental Motion to Strike Plaintiff's Summary Judgment Evidence (Clerk's Dkt. No. 106)

are hereby **DISMISSED** as moot.[6]

      Defendants' Motion to Quash Subpoenas (Clerk's Dkt. No. 115) is hereby **GRANTED**.[7]

      **SIGNED** on February 20, 2015.

_____

MARK LANE
UNITED STATES MAGISTRATE JUDGE
Presiding under 28 U.S.C. § 636(c)

---

[6] Defendants move to strike a number of Buehler's exhibits, arguing they are improperly authenticated, contain hearsay, are inconsistent, and have not been properly served upon Defendants. As found above, summary judgment is granted for Defendants notwithstanding the Court's consideration of the entirety of Plaintiff's exhibits. Accordingly, the pending motions will be dismissed as moot. (Clerk's Dkt. Nos. 101, 106).

[7] Defendants move to quash subpoenas issued in relation to this case. Having granted the motion for summary judgment, the motion to quash will also be granted. (Clerk's Dkt. No. 115).